UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEVEN WATSON,

              Plaintiff,            14-CV-390-LJV-MJR
    -v-                                    REPORT AND
                                                  RECOMMENDATION

NANCY A. BERRYHILL,[1] Acting
  Commissioner of the Social
  Security Administration,

              Defendant.
_____

## INTRODUCTION

    This case has been referred to the undersigned pursuant to Section 636(b)(1)(A) and (B) of Title 28 of the United States Code, by the Honorable Lawrence J. Vilardo, for the hearing and reporting of dispositive motions for consideration by the District Court.  On May 23, 2014, plaintiff Steven Watson ("plaintiff") filed a complaint, pursuant to 42 U.S.C. §405(g) of the Social Security Act (the "Act"), challenging defendant Commissioner of Social Security's ("defendant" or "Commissioner") determination that he is not entitled to Title II Disability Insurance Benefits ("DIB") or Disabled Widower's Benefits ("DWB"). Plaintiff filed a motion for judgment on the pleadings on October 6, 2014 (Dkt. No. 7), the Commissioner cross-moved for the same relief on January 2, 2015 (Dkt. No. 12), and plaintiff filed a reply on January 26, 2015 (Dkt. No. 13).  For the following reasons, it is

---

[1] Carolyn W. Colvin was previously listed as the defendant in this case.  The Court has been put on notice that Nancy A. Berryhill is now the Acting Commissioner of Social Security and that, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant.

recommended that plaintiff's motion for judgment on the pleadings be granted in part and denied in part, and that defendant's motion for judgment on the pleadings be denied.

## BACKGROUND

### Procedural History

Plaintiff filed an application for DIB and DWB benefits on July 14, 2011.  (Tr. 194-207).[2]  He claimed that he had been disabled since December 26, 2007 as a result of back, shoulder and leg problems as well as depression and anxiety.  (Id.).  Plaintiff's application was denied on October 6, 2011, and he filed a timely written request for a hearing.  (Tr. 117-124, 127-128).  Administrative Law Judge Marilyn D. Zahm (the "ALJ") conducted a hearing on October 19, 2012.  (Tr. 67-108).  During the hearing, the ALJ took testimony from plaintiff and Vocational Expert Jay A. Steinbrenner ("VE").[3]  Id.  Following the hearing, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 41-58).  Plaintiff requested review of the determination by the Appeals Council.  (Tr. 37).  On April 17, 2014, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  Plaintiff then filed the instant action.  The alleged onset date of the disability, which was clarified during the hearing, is January 1, 2009.  (Tr. 41).

### Medical Evidence

Plaintiff has an extensive history of severe alcohol abuse and has been diagnosed with alcohol dependence.  He was admitted to numerous treatment facilities and hospitals

---

[2]  References to "Tr." are references to the administrative record in this case.

[3]  At the hearing, plaintiff was represented by J. Patrick Lennon, Esq.

for his alcohol problem between 2009 and 2012.  (Tr. 582, 685, 696, 699, 706, 712, 727).
On February 2, 2009, plaintiff was admitted to Sheehan Health Network for detox.  (Tr. 410).  He attended Kaleida Health Addiction Services MICA program for group and individual therapy sessions from September 13, 2010 through April 12, 2011, and was admitted to Alcohol and Drug Dependency Services inpatient program from January 17, 2012 to February 14, 2012.  (Tr. 581, 586).  Plaintiff was also admitted to ECMC for treatment and detox on approximately eleven occasions between April 8, 2009 through May 14, 2012.  (Tr. 680, 685, 770, 773, 776-777, 781-783, 789-790, 688, 706, 727, 412).

Plaintiff has a history of treatment for mental health issues.  He received treatment at Kaleida Behavioral Health from September 27, 2010 through May 11, 2011.  (Tr. 425).  When discharged, it was noted that plaintiff suffered from bipolar disorder and that his prescribed medications of celexa, remeron, and risperdal appeared to help stabilize him.  *Id*.  Susan Santarpia, Ph.D. provided a consultative psychiatric evaluation of plaintiff on September 8, 2011.  (Tr. 470-474).  She notes that plaintiff reported fluctuating dysphoric mood, irritability, loss of usual interest, chronic worry, restlessness, difficulty concentrating and waking four to five times a night.  (Tr. 471).  She diagnosed plaintiff with bipolar disorder, anxiety disorder, panic disorder without agoraphobia, and alcohol dependence/abuse.  (Tr. 473).  Dr. Santarpia opined that plaintiff appeared to be able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions within normal limits.  (*Id*.).  She further found that plaintiff had mild impairment in relating

adequately with others and appropriately dealing with stress as well as difficulties caused by distractability.  (*Id*.).

Plaintiff's treating psychiatrist, Richard E. Gergelis, M.D., completed a Statement of Disability (Mental Health) on July 24, 2012.  (Tr. 675).  Dr. Gergelis indicated that plaintiff's treating diagnosis included major depression and bipolar disorder, that plaintiff's current symptoms were hopelessness and impulsivity, and that plaintiff was currently stable.  (*Id*.).  He noted that plaintiff's abnormalities included changes in personality, disturbance in mood, emotional instability and impulse control, and emotional withdrawal and isolation.  (Tr. 676).  Plaintiff's depressive symptoms included loss of interest in activities, appetite and sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt of worthlessness, and difficult concentrating.  (Tr. 677).  Dr. Gergelis concluded that plaintiff had moderate restrictions in the area of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and three repeated, extended episodes of deterioration.  (Tr. 678).

Plaintiff has also been treated for physical impairments.  On September 16, 2010, he was admitted to Buffalo General Hospital after falling down five stairs.  (Tr. 508).  Plaintiff was experiencing right shoulder pain, back pain, left hip pain, headaches and abdominal pain.  (Tr. 508-509).  A CT scan of plaintiff's abdomen revealed a ventral hernia, which was repaired on October 15, 2010.[4]  (Tr. 526).

At follow-up appointments on November 18, 2010, December 9, 2010, and March 2, 2011, plaintiff continued to complain of right shoulder and back pain.  (Tr. 654, 652,

---

[4] Plaintiff's surgeries prior to October 5, 2010 include lumbar spine surgeries in 1977, 1985, 1986 and a gastric bypass in 2005.

617).  An imaging of plaintiff's right shoulder on January 12, 2011 suggested a massive tear in his right rotator cuff.  (Tr. 540).  Plaintiff treated at University Orthopaedic Services, Inc. for his shoulder injury.  (Tr. 541-547).  During examinations on March 23, 2011 and March 29, 2011 plaintiff reported significant pain and his right shoulder complex was found to be very tender throughout.  (Tr. 551, 553).  His active range of motion on the right flexicon was 110 degrees, abduction was 100 degrees, extension rotation was 35 degrees, and interior rotation was 35 degrees.  (*Id*.).  Plaintiff had surgery on his right rotator cuff on July 5, 2011.  (Tr. 468).

Steven Balderman, M.D. performed a consultative internal medicine examination on plaintiff on September 8, 2011.  (Tr. 475-478).  Plaintiff presented with lumbar spine pain and right shoulder pain.  (Tr. 475).  Dr. Balderman reported that plaintiff had a slight right foot drop, could not walk on heels or toes, had a normal gait and could squat at 40% of full.  (Tr. 476).  Plaintiff's lumbar spine showed flexion to 60 degrees, extension 0 degrees, lateral flexion 10 degrees bilaterally, and rotary movement 10 degrees bilaterally. (Tr. 477).  His right shoulder elevated to 90 degrees.  (*Id*.).  Dr. Balderman opined that plaintiff had a marked limitation in the use of the right upper extremity for four months due to the recent shoulder surgery, and marked limitation in repetitive bending, lifting, prolonged standing, and prolonged sitting due to lumbar spine disease.  (Tr. 478).

Joseph M. Kowalski, M.D. performed lumber spine surgery on plaintiff on April 10, 2012, including a L4 laminectomy with left-sided foraminolomy and disectomy at L3-4 and L4-5.  (Tr. 663-665).  Plaintiff was readmitted to Erie County Medical Center ("ECMC") on April 23, 2012 through April 27, 2012 due to drainage and wound dehiscence, and was given an antibiotic.  (Tr. 721-722).  Plaintiff was again admitted to ECMC from May 20,

2012 through June 6, 2012 because of a chronic draining back wound and infection.  (Tr. 743-744, 754-755).   He underwent irrigation and debridement of lumber spine and treatment of the infection.   (*Id*.).   Dr. Kowalski completed a Physician Statement of Disability on July 19, 2012.  (Tr. 668).  He indicated that plaintiff could frequently lift and carry up to 20 pounds and that he could lift and carry a maximum of 40 pounds.  (Tr. 672).  Dr. Kowalski further noted that plaintiff could stand or walk less than 2 hours a day, could sit up to six hours a day and could push or pull a maximum of 20 pounds.  (Tr. 473).

*Hearing Testimony*

Plaintiff was 53 years old at the time of the hearing, had completed two semesters of community college and had no vocational training.  (Tr. 71-72).  Plaintiff testified that he did not work from January 2009 through January 2011 due to his back issues and anxiety.  (Tr. 74-75).  Plaintiff further testified that, as a result of his severe drinking problems, he was in and out of various detoxification programs, a halfway house, and a supported living home during this time.  (*Id*.).  Plaintiff was employed part-time at Tops Supermarket from January 2011 through January 11, 2012.[5]  (Tr. 73).  During that time plaintiff worked at the deli counter for twelve to fifteen hours a week and was enrolled in school.  (*Id*.).  He was terminated on January 11, 2012 for drinking on the job.  (*Id*.).

Plaintiff testified that on a typical day he wakes up between 6:30 a.m. and 7:00 a.m., prays and stretches.  (Tr. 75).  He attends outpatient therapy three days a week from 8:45 a.m. to 9:50 a.m.  (*Id*.).  He attends classes for certification in Alcohol Substance Abuse

---

[5]  Plaintiff previously worked as a corrections officer for approximately twenty-five years.  (Tr. 680)  He was terminated from his position at a juvenile detention center in December 2007 due to allegations of child abuse.  (*Id*.)

Counseling on Saturday mornings from 9:30 a.m. to 12:30 p.m. and Monday evenings from 6:30 p.m. to 8:45 p.m.  (*Id.*).  He takes the bus or train to therapy and classes.  (Tr. 76). Plaintiff testified that he is responsible for chores in the halfway house including sweeping and cooking twice a week, and that he does his own laundry.  (Tr. 77).  He attends Alcoholics Anonymous four to five times per week.  (Tr. 81).

When asked during the hearing to describe the impairments that limit him from working, plaintiff indicated that he has anxiety and that his bipolar disorder prevents him from sleeping more than two to three hours at a time.  (Tr. 81).  He testified that his right leg is "grossly weaker" than his left leg due to neuropathy and dropped foot and that the brace he wears limits his movement.  (*Id.*).  Plaintiff testified that on September 16, 2010 he fell down stairs at his daughter's home and was knocked unconscious.  (Tr. 94).  As a result he hurt his back, tore his rotator cuff and tore a hernia in his abdomen.  (*Id.*).  Plaintiff went to physical therapy and had shoulder surgery in July of 2011.  (*Id.*).  Plaintiff testified that since his bone fusion in April of 2012, he developed a staph infection and had additional surgeries to treat the wound.  (Tr. 81).  He testified that the daily pain in his back is an eight or nine out of ten.  (Tr. 82).  He takes Lortab and Motrin several times a day and must constantly switch between standing and sitting.  (Tr. 83).  Plaintiff testified that his back regularly bothered him between January 2009 and April 2012 and that he has a history of back problems and surgeries dating back to 1977.  (Tr. 83).  In addition to the pain medication, plaintiff regularly takes Remeron, Risperdal, Lithium, Trazodone, and Buspar.  Plaintiff also testified that he experiences panic attacks once every two weeks. (Tr. 86).  Plaintiff indicated that when he experiences a panic attack, he has to lay down in a dark room for 10 to 30 minutes until it passes.  (Tr. 87).

The VE was presented with a hypothetical of someone of plaintiff's age, education level, and past experience with light limitations, no repetitive bending or lifting, ability to sit or stand at will, no overhead work with the non-dominant extremity, and no crowded workplaces where the individual would have to be in close physical proximity, without a barrier, to 20 to 25 other people.  (Tr. 101).  The VE testified that this individual could not perform plaintiff's prior work, but could perform the position of Cashier II, which is unskilled, light work, and would be associated with a smaller retail venue.[6]  (Tr. 102).  The second hypothetical involved the same individual, able to walk 10 to 20 minutes, stand 10 to 30 minutes, bend 20 degrees, no kneeling or stooping, sit 30 to 45 minutes, lift and carry 20 to 40 pounds occasionally, push and pull up to 20 pounds, occasionally climbing stairs, unable to reach non-dominant upper extremity beyond the top of head, and panic attacks which would require removal from workplace for 10 to 30 minutes every 2 weeks.  (Tr. 102).  The VE testified that this individual would be able to perform the job of mailroom clerk, which is unskilled, light duty and could be found in colleges, hospitals, and commercial buildings.  (Tr. 102-103).  The VE further testified that this individual could also perform the jobs of plastic molding machine tender and production assembler (small products assembly work).  (Tr. 103).

## **DISCUSSION**

### *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential.  Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are

---

[6]  In evaluating plaintiff's relevant past work experience, the VE did not include the position at Tops because it was not performed often enough to qualify as substantial gainful activity.

"supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may not "substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (*quoting Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions, even if supported by substantial evidence, must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to do so is reversible error. *Id.*

### *Determining "Disability" Under the Act*

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may conclude that a claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for the work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). These steps proceed as follows.

First, the Commissioner must determine whether the claimant is "working" during the time for which they are seeking benefits and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the Commissioner's inquiry is over: the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.*

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant

has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations and the inquiry ends. *Id.*

Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions:  first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is otherwise "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d).  If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If, however, the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five.  Initially, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e).  Residual functional capacity "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1).  The Commissioner's assessment of the claimant's residual functional capacity is then applied at steps four and five.

At step four, the Commissioner "compare[s] [the claimant's] residual functional capacity assessment . . . with the physical and mental demands of [his or her] past relevant work." *Id.* §404.1520(f).  If, based on that assessment, the claimant is able to perform his or her past work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.*

Finally, if the claimant cannot perform his or her past relevant work, the Commissioner considers whether, based on the claimant's residual functional capacity assessment, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* If, however, the claimant cannot perform any other work, he or she is disabled within the meaning of the Act. *Id.*

The burden of proof at steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

A claimant is not entitled to benefits if drug or alcohol abuse was a contributing factor material to the disability. *See* 42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535. In order to determine whether the alcohol or drug abuse was material to the disability, the ALJ must determine whether the claimant would remain disabled if they stopped using the drugs or alcohol. *Id.* It is claimant's burden to prove that the drug or alcohol abuse was not material to a finding of disability. *Cage v. Commissioner of Social Security*, 692 F.3d 118, 123-25 (2d Cir. 2012).

*ALJ's Decision*

Plaintiff meets the insured status requirements of the Act through December 31, 2013 and the non-disability requirement for disabled widower's benefits set forth in Section 202(f) of the Act. As to step one, the ALJ determined that plaintiff has not engaged in

substantial gainful activity since the alleged onset date of January 1, 2009.[7]  With respect

to step two, the ALJ found that plaintiff's severe impairments included lumbar spine

impairments, right shoulder tear and degeneration, right foot drop, bipolar disorder, anxiety

disorder, and alcohol dependence.   The ALJ found that plaintiff's mental impairments

combined with his substance abuse disorder met the requirements of Sections 12.04 and

12.09 of the Listed Impairments.   The ALJ further found that in the absence of substance

abuse, plaintiff's mental impairments, including his bipolar and anxiety disorder, would not

cause more than minimal limitations in his ability to function as "they are well-controlled

with medication and treatment."  However, the ALJ went on to find that if plaintiff stopped

the substance abuse, plaintiff's severe physical impairments would still cause more than

a minimal impact on his ability to perform basic work activities.  As to step three, the ALJ

found that absent the substance abuse, plaintiff's severe impairments do not meet or

medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Turning to steps four and five, the ALJ then determined that, in the absence of

substance abuse, the plaintiff would have the ability to perform light work as defined in 20

C.F.R. Section 404.1567(b), expect that he would require the ability to sit or stand at will,

could not engage in repetitive bending or lifting, and would be precluded from overhead

work with the nondominant upper extremity.  The ALJ went on to find, after posing various

hypotheticals to the VE, that given plaintiff's age, education, work experience, and residual

functional capacity, there were jobs plaintiff could perform.  For this reason, the ALJ

concluded that plaintiff was not disabled within the meaning of the Act.

---

[7]  Plaintiff worked part-time from January 2011 through January 2012, but this work was
performed below the earnings threshold for substantial gainful activity.

*Plaintiff's Challenges*

Plaintiff contends that the ALJ failed to follow the treating physician rule by affording limited weight to Dr. Kowalski's opinion that plaintiff could stand and walk less than two hours per day.   The Court disagrees and finds that the ALJ appropriately applied the treating physician rule by giving controlling weight to the majority of Dr. Kowalski's opinion and providing a sound basis as to why one portion of the opinion was given only limited weight.

A treating physician's medical opinions about the severity of a plaintiff's impairments and symptoms are entitled to "controlling weight" when the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."   20 C.F.R. §404.1527(c)(2).  *See also* 20 C.F.R. §404.1527(a)(2); *Martin v. Astrue*, 337 Fed. Appx. 87, 89 (2d Cir. 2009) ("Although the final responsibility for deciding issues relating to disability is reserved to the Commissioner...an ALJ must give controlling weight to a treating physician's opinion on the nature and severity of the [plaintiff's] impairment when the opinion is well-supported by medical findings and not inconsistent with other substantial evidence.") When determining how much weight to give the opinion of a treating physician, the ALJ is instructed to consider: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion came from a specialist."  20 C.F.R. §416.927(c)(2)(i)-(iv).   If an ALJ refuses to assign a plaintiff's treating physician opinion controlling weight, he or she must state a good reason for that determination.   *Saxton v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011); *Schaal v.*

*Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.")

In his July 2012 Statement of Disability report, Dr. Kowalski, plaintiff's treating spine surgeon, stated that plaintiff was limited from prolonged standing and walking, could lift and carry 20 pounds frequently, could lift and carry a maximum of 40 pounds, could push and pull 20 pounds, could stand and walk less than two hours a day and could sit up to six hours a day.  After the hearing, on November 20, 2012, the ALJ contacted Dr. Kowalski and asked him to provide specific information as to how long plaintiff could stand at one time, how long plaintiff could walk at one time and the total amount of time plaintiff could stand and walk over the course of an eight hour day.  (Tr. 320-321).  However, Dr. Kowalski stated that he could not provide this information without conducting a formal functional capacity exam, which plaintiff indicated he could not afford.  (Tr. 753, 843). Because Dr. Kowalski was unable to provide more specific information as to the amount of time plaintiff could stand or walk, the ALJ afforded limited weight to Dr. Kowalski's opinion that plaintiff could stand and walk for less than two hours a day.  However, the ALJ went on to "give significant weight to Dr. Kowalski's finding that [plaintiff] does have a limitation for prolonged standing or walking, as this is consistent with the record as a whole."  (Tr. 56).  The ALJ further gave "great weight to Dr. Kowalski's opinion that the claimant can lift and carry 20 pounds frequently, push and pull 20 pounds, and sit for up to 6 hours, as this was consistent with the record as a whole and Dr. Kowalski is plaintiff's treating specialist."  These findings are also consistent with Dr. Balderman's opinion that plaintiff had a marked limitation in repetitive bending and lifting and prolonged sitting and standing due to lumbar spine disease.  (Tr. 477-478).

Thus, the only portion of Dr. Kowalski's opinion which the ALJ did not fully credit seems to be his opinion that plaintiff could stand or walk for less than two hours a day. Indeed, the ALJ provided a sound reason for this determination, namely that she sought clarification of the specific amount of time plaintiff could walk or stand both at once and over the course of a day and Dr. Kowalski would not provide an answer without further evaluation, which plaintiff was unable to afford. However, the ALJ did find, based upon both Dr. Kowalski's opinion and the record as a whole, that plaintiff had a limitation for prolonged standing and walking. While the ALJ did not explicitly enumerate each of the factors discussed above in making this differentiation, the Court has considered her findings and analysis, together with the record, and concludes that the treating physician rule was followed. Indeed, the ALJ noted that Dr. Kowalski was a treating specialist who performed surgery on plaintiff, evaluated his opinion in relation to the record as a whole including plaintiff's testimony and the findings of other doctors, and provided a logical reason as to why one portion of the opinion was given only limited weight. *See Reyes v. Colvin*, No. 13-CV-683, 2014 U.S. Dist. LEXIS 183171 (S.D.N.Y. Jan. 26, 2015) (internal citations omitted) ("Although the ALJ is required to explicitly consider all of the factors, the ALJ is not required to explicitly address or recite each factor in his decision."); *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) (finding that, even where it was unclear whether the ALJ applied the treating physician rule, the substance of the treating physician rule was applied because the ALJ considered the treating physician's opinion and its consistency with the record as a whole).

Therefore, to the extent that plaintiff seeks a reversal of the Commissioner's determination because of the ALJ's failure to follow the treating physician rule, it is recommended that plaintiff's motion be denied.

Plaintiff further argues that the ALJ's determination that plaintiff was capable of light work is not supported by substantial evidence. Specifically, plaintiff argues that had Dr. Kowalski's opinion been given the appropriate weight, he would have been found capable of less than sedentary work, and that even if he had the capacity to perform sedentary work, he would be disabled pursuant to Medical Vocational Rule 201.14. Because the ALJ found that plaintiff was capable of light work, and because the Court finds that the ALJ gave appropriate weight to the opinion of Dr. Kowalski, plaintiff's arguments in this regard are rejected as irrelevant. However, for the following reasons, the Court recommends remanding the matter to the Commissioner for reconsideration and clarification of plaintiff's residual functional capacity.

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). In determining the RFC, the ALJ must "consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 07-CV-803, 2009 U.S. Dist. LEXIS 130826 (N.D.N.Y. June 4, 2009); *aff'd* 370 Fed. Appx. 231 (2d Cir. 2010). Here, the ALJ determined that plaintiff has the residual functional capacity to "perform light work...except for the following: he requires the ability to sit or stand at will; he cannot engage in repetitive bending or lifting; and is precluded from overhead work with the nondominant extremity." (Tr. 48). With respect to the sitting and standing

requirements of light work, the ALJ found that "given the ability to change positions at will, [plaintiff] would be capable of sitting and standing during an eight hour day."

The regulations define light work as consisting of the following:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §404.1567.  Indeed, light work requires "a good deal of walking or standing, on or off, for a total of approximately six hours in an eight-hour workday, with sitting occurring intermittently at the time...or light work may involve sitting most of the time with some pushing and pulling of the arms or leg controls."  *Klimek v. Colvin*, 1:15-cv-00789, 2016 U.S. Dist. LEXIS 129804 (N.D.N.Y. July 21, 2016); *accord Social Security Ruling* ("SSR") 83-10, 1983 SSR LEXIS 30, (SSA 1983).  The ALJ gives limited weight to Dr. Kowalski's opinion that plaintiff can stand and walk for less than two hours over the course of the day, but credits the opinion that plaintiff has a limitation for prolonged standing or walking.  No finding is made, however, as to how much plaintiff can stand or walk at one time or total over the course of an eight hour work day.  Indeed, plaintiff testified that he has to consistently switch between sitting and standing and that he can only stand or walk for 10 to 30 minutes at a time without pain.[8]  Dr. Balderman found that plaintiff had a limitation for prolonged standing due to lumbar spine disease.  Even taking into account the general

---

[8] The ALJ found plaintiff's complaints of pain to be out of proportion to the medical evidence.  (Tr. 54)  However, since the ALJ included a "sit/stand at will" requirement in the RFC, she seems to credit the portion of plaintiff's testimony indicating he had to constantly switch from standing to sitting.

ability to "sit or stand at will", there is not substantial evidence in the record that plaintiff could walk or stand, on and off, for a total of approximately six hours a day as is required for light work.  *See Shipman v. Comm'r of Soc. Sec.*, 5:14-CV-0077, 2015 U.S. Dist. LEXIS 124135 (N.D.N.Y. Sept. 17, 2015) ("Without a specific finding of the total duration of time the claimant can spend in each position, merely including a sit/stand/walk at will option is not sufficient to show a claimant can, in fact, make it through an eight hour work day by alternating between those positions.")

Likewise, the record lacks substantial evidence that plaintiff could perform light work that required "sitting most of the time."   As indicated above, Dr. Balderman found that plaintiff had a limitation as to prolonged sitting, and plaintiff testified that he had to consistently switch between sitting and standing.   The ALJ gives great weight to Dr. Kowalski's opinion that plaintiff could sit for up to six hours a day, which is inconsistent with Dr. Balderman's finding that plaintiff had a marked limitation for prolonged sitting. Moreover, the ALJ seems to credit plaintiff's testimony that he needed to frequently switch positions, since the RFC included a requirement that plaintiff should be able to sit or stand at will.   Without clarification as to how often plaintiff would need to change positions and for how long plaintiff could remain continuously in one position, there is not substantial evidence in the record that plaintiff could sit for "most of the time."   *See Falk v. Colvin*, 15-Civ. 3863, 2016 U.S. Dist. LEXIS 110677 (S.D.N.Y. Aug. 18, 2016) (ALJ failed to properly determine extent of plaintiff's limitation, rending the RFC assessment incomplete, where he made no determination as to the frequency with which plaintiff would need to alternate between standing and sitting); *Allen v. Colvin*, 3:14-cv-1368, 2016 U.S. Dist. LEXIS 42037

(N.D.N.Y. March 30, 2016) (remand appropriate where ALJ determined that plaintiff could perform light work, but it was unclear on what medical evidence that finding was made).

Some courts have found that limitations as to prolonged sitting or standing do not necessarily preclude an individual from performing light work. *See Carroll v. Colvin*, 13-CV-456, 2014 U.S. Dist. LEXIS 88819 (W.D.N.Y. June 30, 2014) ("several courts have upheld an ALJ's decision that the claimant can perform the requirements of light or sedentary work even when there is evidence that the claimant has moderate difficulties in prolonged sitting or standing"). However, without a more specific finding as to plaintiff's capabilities for standing and walking at one time and over the course of an eight hour day, as well as the frequency with which he would need to change positions, such a determination cannot be made here. The ALJ sought additional information from Dr. Kowalski as to exactly how long plaintiff could sit or stand at one time, which suggests that this information was highly relevant to her determination of plaintiff's RFC. Plaintiff's inability to pay for the functional capacity examination should not prevent an accurate and complete determination of his capabilities. An "ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); 20 C.F.R. §416.913(e)(1)-(3) ("the record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity"). To that end, when faced with gaps or ambiguities in the record, the regulations provide various options for ALJ's such as re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others. *See* 20 C.F.R. §416.920b. While re-contacting the treating physician was unsuccessful here, the ALJ should have

considered whether further examination of the administrative record, requesting additional medical records, or arranging another consultative exam would have clarified plaintiff's abilities to stand and walk over the course of the day as well as how often he would need to change positions.  The Court notes that another consultative exam may have been especially appropriate here, since Dr. Balderman's exam took place before plaintiff's spine surgery.

For these reasons, the Court recommends remanding this matter to the Commissioner for further development of the record as well as reconsideration and clarification of plaintiff's residual functional capacity.

Finally, plaintiff argues that the ALJ did not properly assess his credibility nor did she give adequate consideration to his positive work history.  In light of the recommendation to remand this matter for further proceedings, the Court declines to reach these arguments. Instead, it is recommended that the Commissioner be instructed to reconsider these findings in light of the record as a whole following remand.  *Weiland v. Colvin,* 6:16-cv-06100, 2007 U.S. Dist. LEXIS 15947 (W.D.N.Y. Feb. 4, 2017) (where remand was ordered for reconsideration of plaintiff's RFC and further development of the administrative record, the court declined to address plaintiff's credibility arguments since "plaintiff's credibility must be reconsidered on remand upon thorough consideration of the fully developed administrative record"); *Palmer v. Colvin*, 1-15-CV-00402, 2016 U.S. Dist. LEXIS 170838 (W.D.N.Y. Dec. 9, 2016) (where the court expected that the ALJ's RFC assessment and/or findings regarding the listings would necessarily be altered when considered on remand, the court declined to address plaintiff's further argument as to credibility and the ALJ's step four finding).

## CONCLUSION

For the foregoing reasons, it is recommended that plaintiff's motion (Dkt. No. 7) be denied in part and granted in part, that defendant's motion (Dkt. No. 12) be denied, and that the case be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.  Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y.  L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and

recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." *Failure to comply with these provisions may result in the District Court's refusal to consider the objection.*

**SO ORDERED.**

DATED:      February 16, 2017
            Buffalo, New York

                              */s/ Michael J. Roemer*
                              MICHAEL J. ROEMER
                              UNITED STATES MAGISTRATE JUDGE